UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
JENNIFER LYNN PITTA,

                    Plaintiff,

                                        MEMORANDUM & ORDER
          -against-                     14-CV-7595(JS)

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                    Defendant.
----------------------------------X
APPEARANCES
For Plaintiff:      Jennifer L. Pitta, pro se
                    86 Sycamore Lane
                    Levittown, New York 11756

For Defendant:      Candace Scott Appleton, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201


SEYBERT, District Judge:

          Pro se plaintiff Jennifer Pitta ("Plaintiff") commenced

this action under Section 205(g) of the Social Securities Act, as

amended, 42 U.S.C. § 405(g), challenging the Commissioner of

Social Security's ("the Commissioner") denial of her application

for disability insurance benefits and supplemental security

income.  Presently before the Court is the Commissioner's motion

for judgment on the pleadings.  (Docket Entry 15.)  For the

following reasons, the Commissioner's motion is GRANTED.

BACKGROUND[1]

Plaintiff filed applications for disability insurance benefits and Supplemental Security Income ("SSI") on February 22, 2012, claiming a disability since January 1, 2010. (R. 181-94.) Plaintiff attributes her disability to chronic obstructive pulmonary disease ("COPD"), chronic gastritis, and arthritis in her fingers. (R. 220.)

After her applications were denied, Plaintiff requested a hearing before an administrative law judge. (R. 119.) The hearing took place on April 10, 2013 before Administrative Law Judge Bruce MacDougall (the "ALJ"). (R. 81-105.)

On April 17, 2013, the ALJ issued his decision finding that Plaintiff is not disabled. (R. 66-76.) The ALJ's decision is considered the final decision of the Commissioner because the Appeals Council denied Plaintiff's request for review on November 5, 2014. (R. 1-4.)

I.  Evidence Presented to the ALJ

    A.  Testimonial Evidence

        Plaintiff was born in 1961 and completed high school and one year of college. (Comm'r Br., Docket Entry 16, at 2.) She worked as a clerk at a car auction house from the mid-1990s through

---

[1] The facts of this case are taken from the administrative record filed by the Commissioner on March 30, 2015. (Docket Entries 8, 8-1.)

2005 and then as a waitress from October 2011 through December 2011 as a waitress. (R. 85-89; Comm'r Br. at 2.)

At the administrative hearing held on April 10, 2013, Plaintiff testified that she had breathing difficulties, arthritis, back problems, and neck pain. (R. 91-93, 96, 103.) She left her job at the car auction house in 2005 due to COPD that had been caused by the fumes. (R. 89-90; Comm'r Br. at 2.) She testified that she also smoked cigarettes and that contributed to her lung problem; however, she no longer smoked. (R. 90.) Plaintiff said she "can't ever breathe." (R. 91.) She was prescribed two inhalers and Prednisone and used a nebulizer four times per day, but the medication made her head spin. (R. 91-93.) She had gastritis since she was twenty-five years old; sometimes it caused her to suddenly throw up. (R. 98-99.) Plaintiff stated she also had memory problems, difficulty sleeping, and dizziness. (R. 90, 92, 95, 99.) She testified that constant noise from electricity "drives [her] crazy." (R. 96, 99-100, 102.) Plaintiff said she had breast nodules since she was a teenager and that they had to be removed approximately every couple of years. (R. 100-01.) She testified that she had anxiety and depression but was not seeing a psychiatrist. (R. 101.) A doctor prescribed Zoloft. (R. 101.) Plaintiff said she had a herniated disc in her back in 2002 caused by dragging a car battery. (R. 96.) She now has arthritis in one of her arms and shoulder and could not lift a

gallon of milk.  (R. 96.)  She was being treated for those problems and prescribed medication and vitamins.  (R. 97.)  Physical therapy had also been recommended, but she had difficulty traveling there. (R. 97-98.)

Plaintiff lives alone.  (R. 94.)  She occasionally drove a car but had difficulty as a result of her medication and distracting noises.  (R. 94.)  She said her medication made her dizzy and caused "blurry" vision all the time.  (R. 90, 99.) Plaintiff said her adult daughters helped with chores such as shopping, cooking, cleaning, and laundry.  (R. 94.)  She watched television; she reads but sometimes had difficulty due to memory problems.  (R. 95.)  Plaintiff said she rarely went out due to bothersome noises and anxiety.  (R. 95-96.)  She said that her children and her sister come to visit her.  (R. 95.)  She socialized with a friend who lived out of state by telephone.  (R. 95.)

In a function report, (see R. 238-46), Plaintiff stated that she used a "breathing machine" three times per day, watched television, and tried to read and take a walk.  (R. 238.)  She said it was very hard for her to breathe; she would cough, wheeze, and would have to sit up.  (R. 238, 243.)  She stated that everything she did was a "major chore" and had to be done slowly. (R. 238, 241.)  She prepared meals daily, such as sandwiches and meals that could be prepared in a microwave or Crock-Pot.  (R. 241, 248.)  She shopped in stores, by phone, and by mail.  (R. 242,

248.)  She socialized by phone, and even went to church one to three times per month.  (R. 243.)

Plaintiff did not use any assistive devices.  (R. 245.) She could stand but not for too long and could walk one-quarter to one-half block.  (R. 243, 245.)  She had difficulty sitting, squatting, kneeling, climbing stairs, and lifting.  (R. 243-44.) She could see and hear but could not speak for long due to breathing problems.  (R. 244.)  Plaintiff stated she had difficulty paying attention but could follow spoken and written instructions. (R. 245.)  She said she had difficulty remembering and handling stress (R. 246) and she could count change and pay bills but could not handle a savings account (R. 242).

In a pain report, (R. 246-48), Plaintiff stated that she has had stomach pain since she was twenty-five-years-old. (R. 246.)  The stomach pain caused burping, chest pain, diarrhea, and vomiting.  (R. 247-48.)  She was prescribed Nexium and took Pepcid tablets.  (R. 247.)  The medication took effect in one-half hour to one hour and lasted for six to ten hours only if she did not move or eat.  (R. 247.)  Her breathing problems also caused pain.  (R. 246.)

B.  Medical Evidence

On December 27, 2011, family practitioner Dr. Roseann Fazio stated that Plaintiff had chronic respiratory illness and other medical problems.  (R. 264.)  These problems inhibited her

ability to engage in employment beginning on December 26, 2011. (R. 264.)

A CT-scan of Plaintiff's chest performed on February 3, 2012, showed the following: mild emphysematous change with non-calcified lung nodules, an indeterminate mass in the liver, and a small pericardial effusion. (R. 274-75.) Plaintiff had no pleural disease and mild to moderate degenerative changes in her thoracic spine. (R. 274-75.)

Plaintiff saw Dr. Rameen Miarrostami on February 3, 2012. (R. 280.) Plaintiff's chief complaint was back pain of one month's duration. (R. 280.) Plaintiff had smoked one pack of cigarettes per day for thirty-five years. (R. 280.) She experienced coughing, shortness of breath, wheezing, and occasional chest pain. (R. 280.) An EKG performed that day showed normal sinus rhythm. (R. 280, 288.) Spirometry had showed severe obstruction. (R. 286.) On examination, Plaintiff was alert, fully oriented, and in no acute distress. (R. 280.) Her respiratory rate was fourteen breaths per minute, and her oxygen saturation rate was 98%. (R. 280.) Her air entry was clear, and rhonchi were present and her cardiovascular, abdominal, and extremities examinations were normal (R. 280, 286-87.) Dr. Miarrostami diagnosed COPD, respiratory insufficiency, tobacco addiction, gastritis, and mid-back pain. (R. 280.) He ordered spine x-rays, chest CT-scan, prescribed Symbicort and Nexium, and strongly urged

Plaintiff to stop smoking.  (R. 280.)  In a note written on that day, Dr. Miarrostami stated that Plaintiff had severe COPD and could not work until further notice.  (R. 272.)

In a medical report for a determination of disability and employability dated February 16, 2012, (R. 265-66), Dr. Fazio opined that Plaintiff could lift ten pounds occasionally and stand and/or walk for less than two hours per day.  (R. 265.)  She did not complete the section inquiring whether mental illness affected Plaintiff's employability.  (R. 266.)  Dr. Fazio stated that COPD prevented Plaintiff from working.  (R. 265.)  She opined that Plaintiff would never be able to work.  (R. 265.)

Spirometry performed on February 18, 2012 showed that prior to the administration of medication, Plaintiff had a severe obstruction to airflow, mild air trapping, and severely reduced diffusion capacity.  (R. 273, 286, 331.)  Her oxygen saturation rates were 99% on room air at rest and 98% after exercise--a 600-foot walk.  (R. 273.)  Upon administration of medication, airway obstruction was reversible.  (R. 273.)  Her forced expiratory volume ("FEV1") rose to 66% of predicted, and her total lung capacity ("TLC") was 69% of predicted.  (R. 273.)

During a visit to Dr. Miarrostami on February 24, 2012, Plaintiff denied having chest pain, palpitations, nausea, or vomiting.  (R. 281.)  She was still smoking cigarettes.  (R. 281.)  An abdominal MRI performed on February 17, 2012 had revealed a

liver hemangioma. (R. 282-83.) On examination, Plaintiff was alert and fully oriented. (R. 281.) Her respiration rate was fourteen breaths per minute; her lungs were clear, and examinations of the abdomen and extremities were normal. (R. 281.) Dr. Miarrostami diagnosed COPD, liver hemangioma, and tobacco addiction. (R. 281.) He again advised Plaintiff to stop smoking. (R. 281.)

An echocardiogram performed on March 28, 2012, revealed: normal left ventricular size with normal global systolic and diastolic function, no pericardial effusion, no cardiac masses, and trace tricuspid regurgitation. (R. 300.) In an undated report, (R. 321-25), Dr. Fazio stated that she had first seen Plaintiff in March 2012. (R. 321.) Plaintiff had chronic COPD with the following symptoms: shortness of breath on exertion, chronic cough, chronic fatigue, and dyspnea. (R. 321, 324.) Dr. Fazio referred to Dr. Miarrostami's treatment, pulmonary function tests, and chest CT-scan for more information. (R. 322-23.) Dr. Fazio stated that there were no other conditions significant to recovery. (R. 325.) She did not opine on Plaintiff's residual function capacity ("RFC"). (R. 324.)

On April 3, 2012, Plaintiff received a consultative examination by Dr. Iqbal Teli. (R. 301-03.) Plaintiff said her chief complaint was bilateral finger pain of ten years duration. (R. 301.) Plaintiff had been diagnosed with emphysema in 2011 and

used Albuterol and Dulera inhalers.  (R. 301.)  She said she had started smoking in 1975 and smoked ten cigarettes per day. (R. 301.)  Her respiratory rate was fourteen breaths per minute. (R. 301.)  She had normal gait and stance, could squat 70% of the way, and was in no acute distress.  (R. 302.)  Plaintiff used no assistive devices, needed no help changing for the examination or getting on or off the examination table, and was able to rise from a chair without difficulty.  (R. 302.)  She could not walk on her heels and toes.  (R. 302.)  An examination of her lungs revealed normal diameter, bilateral wheezing, normal percussion and diaphragmatic motion, and no significant chest wall abnormality. (R. 302.)  Plaintiff had full ranges of motion in the cervical and lumbar spines, shoulders, elbows, forearms, wrists, hips, knees, and ankles, but her straight leg raising was negative bilaterally. (R. 302.)  She had full (5/5) strength, normal reflexes, and no sensory deficits in the upper and lower extremities.  (R. 303.) Plaintiff's hand and finger dexterity was intact, and she had full grip strength.  (R. 303.)  X-rays of Plaintiff's right hand were within normal limits.  (R. 303.)  Dr. Teli diagnosed history of pain over both hands and history of emphysema.  (R. 303.)  He opined that Plaintiff's only limitation was to avoid dust and other respiratory irritants.  (R. 303.)

X-rays of Plaintiff's lumbosacral spine and cervical spine conducted on April 16, 2012, showed degenerative changes.

(R. 305-06.)  One month later, Plaintiff went to Maimonides Hospital Emergency Department for exacerbation of COPD.  (R. 326-29.)  In addition to the medications she was already taking--Albuterol, Nexium, Pepcid, and Vitamin D-3, Prednisone was prescribed.  (R. 327.)

On May 9, 2012, Plaintiff complained to Dr. Miarrostami of shortness of breath but indicated that she had run out of Ventolin.  (R. 341.)  She denied having chest pain, nausea, or vomiting and stated that she had cut down on smoking.  (R. 341.)  Her respiratory rate was fourteen breaths per minute, and her oxygen saturation rate was 99%.  (R. 341.)  Cardiovascular, abdominal, and extremities examinations were normal.  (R. 341.)  Dr. Miarrostami diagnosed COPD, respiratory insufficiency, tobacco addiction, and multiple subcentimeter pulmonary nodules.  (R. 341.)  He, again, "strongly" advised Plaintiff to stop smoking.  (R. 341.)  Approximately one week later, Dr. Miarrostami found Plaintiff to be alert, oriented, and in no acute distress.  (R. 342.)  Her respiratory rate was fourteen breaths per minute, and her oxygen saturation rate was 98%.  (R. 342.)  Her cardiovascular, abdominal and extremities examinations were normal.  (R. 342.)  He diagnosed COPD, tobacco addiction, and a history of multiple pulmonary nodules.  (R. 342.)  He, once again, "strongly" advised Plaintiff to stop smoking.  (R. 342.)

Plaintiff returned to Dr. Miarrostami on August 17, 2012, and stated that she had a cough and shortness of breath, but no chest pain, palpitations, nausea, vomiting, abdominal pain, dizziness, or pain in her back, neck, or joints. (R. 343-44.) Plaintiff said she was still smoking but had cut down on her drinking. (R. 343.) She said she was working as a waitress and that she had been to the emergency room twice--once in New York and once in Florida--since her last visit. (R. 343.) She reported using her emergency inhaler once per day. (R. 343.) On examination, Plaintiff's lungs were normal for percussion, and her oxygen saturation rate was 95%. (R. 343.) Ear, nose and throat, neck, cardiovascular, and gastrointestinal examinations were normal. (R. 343.) Plaintiff's muscle strength, tone, and gait were within normal limits. (R. 343.) She was alert, oriented to time, place and person, and had a normal mood and affect. (R. 343.) Dr. Miarrostami diagnosed COPD, respiratory insufficiency, tobacco dependence, and bilateral lung nodules. (R. 343-44.) As with the visits before, Plaintiff was "strongly" advised to stop smoking. (R. 344.)

Plaintiff visited Dr. Lourdes P. Esteban, a psychiatrist and neurologist, on August 27, 2012, complaining of headaches over the past six years with associated symptoms. (R. 334-35.) Plaintiff was in no apparent distress; she was fully alert and fully oriented. (R. 335.) She had decreased range of motion in

her neck, but a neurological examination was normal. (R. 335.) Plaintiff had full strength in all major muscle groups, normal muscle tone, and a normal gait. (R. 335.) A gastrointestinal examination was normal. (R. 335.) A respiratory examination indicated decreased and coarse breath sounds and wheezing. (R. 335.) Her affect and demeanor were anxious and depressed, but she had normal psychomotor function, normal speech pattern, and normal thoughts and perception. (R. 335.) Dr. Esteban diagnosed cervical myofascial sprain and stated that her anxiety and depression were magnifying her symptoms. (R. 335.)

A CT-scan of Plaintiff's chest conducted on August 27, 2012, showed mild emphysematous change with several small noncalcified right upper lung nodules, bilateral lower lung atelectasis, stable small pericardial effusion, and a stable hepatic hemangioma. (R. 345-46.) One week later, an MRI of Plaintiff's cervical spine showed: straightening of the lordosis that was likely secondary to muscle spasm or positioning; mild degenerative spondylosis without disc herniation, cord impingement, or central canal stenosis; mild right C3/C4, C5/C6 and C6/C7 neural foraminal stenosis; and mild C4/C5 left neuroforaminal stenosis. (R. 337.)

Plaintiff continued seeing Dr. Fazio in 2012 through March 2013. (R. 354-60.) In a letter dated November 2, 2012, Dr. Fazio stated that Plaintiff had generalized anxiety disorder with

depression, COPD, chronic degenerative disease of the cervical and lumbar spines with chronic pain, gastroesophageal reflux disorder ("GERD"), and irritable bowel syndrome. (R. 359.) She opined that Plaintiff was "totally disabled" at this time. (R. 359.)

When Plaintiff next saw Dr. Miarrostami on December 14, 2012, she complained of cough, shortness of breath, and wheezing. (R. 348-49.) She said she had not been smoking heavily since June; however, she reported that she periodically smokes and the last time was a few days earlier. (R. 348.) Dr. Miarrostami noted that she was an "every day smoker." (R. 348.) Plaintiff denied having back pain, neck pain, joint pain, abdominal pain, nausea, vomiting, chest pain, headaches, or dizziness. (R. 348.) On examination, there were rhonchi, mild wheezing, and her oxygen saturation rate was 98%. (R. 349.) Her ears, cardiovascular, and gastrointestinal examinations were normal. (R. 348.) Plaintiff's muscle strength, tone, gait, and station were within normal limits and there were no abnormalities in her extremities. (R. 349.) Dr. Miarrostami diagnosed COPD, tobacco dependence, and once again "strongly" advised Plaintiff to stop smoking. (R. 349.)

Pulmonary function testing performed on January 8, 2013 showed prior to the administration of medication: a moderate to severe obstruction, minimal air trapping, and normal diffusion capacity. (R. 333.) FEV rose to 70% of predicted upon

administration of medication, and TLC was 68% of predicted.  (R. 333.)  Plaintiff received physical therapy on January 9, 2013. (R. 370.)

In a medical report dated January 10, 2013, Dr. Esteban referred to an examination on January 9.  (R. 339-40.)  Plaintiff's diagnoses were: cervical myofascial sprain secondary to bulging discs with foraminal stenosis; lumbar myofascial sprain; anxiety disorder; depression; and vestibular dysfunction.  (R. 339.) Review of musculoskeletal, respiratory, and neurological systems were abnormal, and mental disorders were present.  (R. 339.)  Dr. Esteban opined that Plaintiff could carry ten pounds occasionally, stand and/or walk for less than two hours per day, and sit for less than six hours per day.  (R. 340.)  Plaintiff had postural limitations due to neck and back problems, dizziness, and inability to breathe.  (R. 340.)  Plaintiff had normal abilities to: understand, carry out, and remember instructions; respond appropriately to co-workers and supervisors; and meet quality standards and production.  (R. 340.)  Dr. Esteban opined that Plaintiff would "always" take time off because of neck and back pain and breathing difficulties.  (R. 340.)  Plaintiff's manipulative abilities were normal.  (R. 340.)  Plaintiff's ability to tolerate dust, fumes, and extreme temperatures was limited due to COPD or emphysema.  (R. 340.)

On January 25, 2013, Plaintiff complained to Dr. Miarrostami of throat discomfort and denied dyspnea, wheezing, headaches, fatigue, and pain in her chest, abdomen, back, neck and joints. (R. 350, 353.) The doctor indicated that she was a "current every day smoker." (R. 350.) Plaintiff said she needed to have disability forms filled out. (R. 350.) On examination, Plaintiff was alert, fully oriented, and displayed a normal mood and affect. (R. 353.) The lung examination was normal for percussion, palpation, and clear to auscultation. (R. 353.) Ear, neck, cardiovascular, gastrointestinal examinations, and her strength, muscle tone, gait, station and extremities were all normal. (R. 350.) Dr. Miarrostami diagnosed respiratory insufficiency, COPD, and pharyngitis. (R. 350.) Plaintiff was once again advised to stop smoking. (R. 353.)

In medical reports dated January 25, 2013, (R. 374-78) Dr. Miarrostami stated that Plaintiff had a history of moderate COPD, smoking, and a right lung nodule (R. 376). He listed the pulmonary function testing results and indicated that Plaintiff had complied with medical treatment. (R. 374.) He stated that mental disorders were present. (R. 374.) A lung examination revealed bilateral rhonchi. (R. 376.) Plaintiff's hearing and manipulative functions were normal. (R. 375.) She had abnormalities in her abilities to perform postural activities such as: repetitive stooping and bending for long periods; remaining

seated for long periods; and crouching or squatting. (R. 375.) Her abilities to tolerate dust, fumes, extreme temperatures, heights, and machinery were abnormal. (R. 375.) She could operate a motor vehicle. (R. 375.) The doctor stated that Plaintiff could: understand, carry out, and remember instructions; respond appropriately to co-workers and supervision; meet quality standards and production norms; and sustain adequate attendance. (R. 375.) Dr. Miarrostami opined that Plaintiff could lift ten pounds occasionally, stand and/or walk for less than two hours per day, and sit for less than six hours per day. (R. 375.) She could walk one block before experiencing dyspnea. (R. 376.)

In a document dated January 28, 2013, Plaintiff listed her doctors and medications they prescribed. (R. 379.) Dr. Miarrostami prescribed Prednisone, Celebrex, and inhalers; Dr. Fazio prescribed vitamins B12 and D, folic acid, and Tramadol; Dr. Esteban prescribed Trazodone, Sertraline, and Montelukast; and Dr. Chin prescribed Meclizine and Famotidine. (R. 379.)

Plaintiff went to Maimonides Hospital Emergency Department on February 11, 2013 for asthma with acute exacerbation. (R. 372.) She was advised to follow-up with her doctor. (R. 372.)

In a letter dated April 5, 2013, Dr. Fazio stated that she had seen Plaintiff for the last couple of years for medical problems, including gastritis, acute respiratory disease, and COPD. (R. 371.) Her symptoms were chronic cough, shortness of

breath, and wheezing.  (R. 371.)  Dr. Fazio opined that these conditions and symptoms had probably existed for a few years before 2011, especially given her long history of smoking and exposure to automobile fumes.  (R. 371.)

C.    Medical Evidence Submitted to the Appeals Council

1.    Prior to April 17, 2013

On February 29, 2012, Dr. Kathleen O'Connor performed a Gynecological examination, (R. 385-86), the results of which were normal.  (R. 385.)  Plaintiff denied fatigue, malaise, and gastrointestinal issues.  (R. 385.)  Her mood was euthymic; she appeared well and in no acute distress.  (R. 385.)

A bone density scan performed on February 29, 2012 showed normal bone mineral density of the hips and osteopenia of the femoral necks and lumbar spine.  (R. 421-22.)  A March 14, 2012 mammogram was normal, and breast sonograms revealed bilateral cysts.  (R. 423-24.)

On March 14, 2012, Dr. Anant Indaram noted that Plaintiff had a history of GERD and H. Pylori.  (R. 388.)  Plaintiff still had COPD and was smoking one pack of cigarettes day--she stated that she used to smoke two packs per day.  (R. 387.)  She said she was feeling fine.  (R. 388.)  She had acid reflux when eating certain foods, intermittent difficulty swallowing, and heartburn. (R. 388.)  She had not been vomiting and had no abdominal pain. (R. 388.)  Plaintiff was oriented to time, place, and person.

(R. 388.)  Examination of the lungs revealed normal breath sounds and no dyspnea.  (R. 388.)  Examination of the abdomen revealed normal bowel sounds and no abdominal tenderness or masses.  (R. 388.)  Dr. Indaram diagnosed GERD and to continue medications prescribed by doctor.  (R. 389.)

Plaintiff went to Maimonides Hospital on May 5, 2012 for exacerbation of COPD.  (R. 501-15.)  She had had difficulty breathing and a cough for a few days and stated that her nebulizer was not working.  (R. 501-02.)  She had no gastrointestinal complaints and no musculoskeletal complaints, and she was not in any pain, except for mild back pain which she rated a three out of ten.  (R. 501, 503, 508.)  She was a current every day smoker.  (R. 501.)  She had diminished breath sounds, fast and labored breathing at times, and scattered wheezing, but overall, air entry was good.  (R. 501, 503, 508-09.)  Plaintiff was fully oriented and alert.  (R. 501.)  Cardiovascular, abdominal, and neurological examinations were normal.  (R. 503.)  An examination of Plaintiff's extremities were normal and she had normal ranges of motion and ambulated without assistance.  (R. 501, 503.)  Chest x-rays showed clear lungs with mild atelectasis at the bases.  (R. 506.)  She was treated with nebulizers and Prednisone and had a positive response.  (R. 502.)  At discharge, Plaintiff's lungs were clear; she was stable and breathing without difficulty.  (R. 507.)

Plaintiff underwent an esophagogastroduodenoscopy

("EGD") and a colonoscopy on May 16, 2012. (R. 390-405, 517.)
Examination prior to the procedures showed that heart, lungs, and
abdomen were within normal limits. (R. 390.) The EGD revealed
clear oral, laryngopharynx, and esophagus and diffuse gastritis.
(R. 405.) Biopsy results reflected that Plaintiff had inactive
chronic gastritis with abnormality in the gastric glands and no
organisms consistent with H. pylori. (R. 425-26.) Colonoscopy
revealed internal hemorrhoids and no polyps. (R. 399.)

On May 18, 2012, Dr. Miarrostami filled out a medical
report for a determination of disability. (R. 482-84.)
Plaintiff's diagnoses were COPD and a history of multiple pulmonary
nodules. (R. 482-83.) When seen that day, her lung and air entry
were clear. (R. 483.) FEV was 66% of predicted; DLCO was 59% of
predicted, and TLS was 69% of predicted. (R. 484.) Dr.
Miarrostami prescribed Dulera and Ventolin. (R. 484.)

On June 25, 2012, Dr. Indaram observed that Plaintiff
appeared normal and in no acute distress. (R. 406.) He
characterized her May 2012 EGD and colonoscopy results as normal.
(R. 406.) Plaintiff's abdominal examination was normal. (R. 406.)

Plaintiff saw Dr. Mauro L. Ruffy on August 20, 2012
complaining of vertigo after a "Disney ride." (R. 498.) Plaintiff
had normal tympanic membranes with no middle ear efusion. (R.
498.) Dr. Ruffy assessed dysfunction related to the vestibule of
the inner ear with no known cause. (R. 498.) She was to undergo

electronystagmography and brain stem audiometry. (R. 498.) Plaintiff also saw Dr. Fazio on March 29, 2013, regarding a possible cyst on her hand. (R. 447.)

II. <u>Decision of the ALJ</u>

After reviewing the evidence in the record, the ALJ issued his decision on April 17, 2013, finding that Plaintiff was not disabled. (R. 69-76.) The ALJ found that Plaintiff's depression did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities. (R. 72.) The ALJ concluded that Plaintiff has the RFC to "perform light work as defined in 20 C.F.R. 404.1567(b) and 416.867(b) except the claimant must avoid excessive exposure to airborne irritants and environmental allergens." (R. 73.)

II. <u>The Decision of the Appeals Council</u>

Plaintiff petitioned the Appeals Council to review the ALJ's decision and provided new evidence from Dr. Lvov dated February 20, 2014 and July 3, 2013 through March 15, 2014. (R. 2.) On November 5, 2014, however, the Appeals Council denied Plaintiff's petition to appeal the ALJ's decision, stating that it "found no reason under [its] rules to review the Administrative Law Judge's decision." (R. 1.) The Appeals Council considered the evidence and found that it was new information about a later time period than the one in question, so it did not affect the ALJ's decision about whether the Plaintiff was disabled beginning

on or before April 17, 2013. (R. 2.) Thus, the ALJ's decision is considered the final decision of the Commissioner. (R. 1.)

III. <u>This Appeal</u>

Plaintiff commenced this action on December 30, 2014. (Docket Entry 1.) The Commissioner filed the administrative record on March 30, 2015 and its Answer on April 15, 2015. (Docket Entries 8, 9.) The Commissioner moved for judgment on the Pleadings on August 26, 2015. (Docket Entry 15). This motion is presently before the Court.

DISCUSSION

I. <u>Standard of Review</u>

In reviewing the ruling of the ALJ, this Court will not determine <u>de novo</u> whether Plaintiff is entitled to disability benefits. Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ. <u>See</u> <u>Jones v. Sullivan</u>, 949 F.2d 57, 59 (2d Cir. 1991). Instead, the Court must determine whether the ALJ's findings are supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard." <u>Curry v. Apfel</u>, 209 F.3d 117, 122 (2d Cir. 2000) (internal quotations marks and citation omitted), <u>superseded by statute on other grounds</u>, 20 C.F.R. § 404.1560. If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists. <u>See</u> <u>Johnson</u>

v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion." Id. (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971)). The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions of law drawn from such facts. See id.

To determine if substantial evidence exists to support the ALJ's findings, this Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences may be drawn." See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).

A. Eligibility for Benefits

A claimant must be disabled within the meaning of the Social Security Act (the "Act") to receive disability benefits. See Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); 42 U.S.C. § 423(a), (d). A claimant is disabled under the Act when he can show an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A).  The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The Commissioner must apply a five-step analysis when determining whether a claimant is disabled as defined by the Act.  See 20 C.F.R. §§ 404.1520, 416.920.  First, the Commissioner considers whether the claimant is currently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  Second, the Commissioner considers whether the claimant suffers from a "severe medically determinable physical or mental impairment" or a severe combination of impairments that satisfy the duration requirement set forth at 20 C.F.R. § 404.1509.[2]  Third, if the impairment is "severe," the Commissioner must consider whether the impairment meets or equals any of the impairments listed in Appendix 1 of the Social Security regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  "These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and

---

[2] 20 C.F.R. § 404.1509 provides that "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."

entitled to benefits." <u>Dixon v. Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995) (citation omitted). <u>Fourth</u>, if the impairment or its equivalent is not listed in the Appendix, the claimant must show that he does not have the RFC to perform tasks required in his previous employment. 20 C.F.R. § 404.1520(a)(4)(iv). <u>Fifth</u>, if the claimant does not have the RFC to perform tasks in his or her previous employment, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform. 20 C.F.R. § 404.1520(a)(4)(v). If not, the claimant is disabled and entitled to benefits.

The claimant has the burden of proving the first four steps of the analysis, but the Commissioner carries the burden of proof for the last step. <u>See</u> <u>Shaw</u>, 221 F.3d at 132. As Plaintiff is proceeding <u>pro se</u>, she is "entitled to a liberal construction of [her] pleadings, which should be read to raise the strongest arguments that they suggest." <u>Green v. United States</u>, 260 F.3d 78, 83 (2d Cir. 2001) (internal quotation marks and citation omitted); <u>see</u> <u>also</u> <u>Alvarez v. Barnhart</u>, No. 03-CV-8471, 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) ("It is well established that any papers submitted by a <u>pro se</u> litigant should be held to a less stringent standard than those drafted by attorneys . . . .").

"In making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the

subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Boryk ex rel. Boryk v. Barnhart, No. 02-CV-2465, 2003 WL 22170596, at *8 (E.D.N.Y. Sept. 17, 2003).

Here, the ALJ performed the above analysis and found that Plaintiff had not engaged in substantial gainful activity since January 1, 2010. (R. 71.) The ALJ then found that Plaintiff had the following severe impairments: COPD and arthritis. (R. 71.) The ALJ next determined that none of Plaintiff's impairments or any combination of his impairments are the medical equivalent of any impairment enumerated in Appendix 1 of the Regulations. (R. 73.) The additional steps are discussed below.

The Court must now determine whether the ALJ's decision is supported by substantial evidence. The Commissioner has moved for judgment on the pleadings, and Plaintiff filed only a brief opposition letter that does not appear to assert any specific arguments on her behalf. (See generally Pl.'s Ltr., Docket Entry 17.) In that regard, the Court discusses the Commissioner's four defenses below: (1) Plaintiff's depression and gastritis were not severe impairments; (2) the ALJ properly assessed Plaintiff's RFC; (3) the ALJ's findings at steps four and five were correct; and (4) the evidence submitted to the Appeals Council would not

change the ALJ's decision. (See Comm'r Br., Docket Entry 16, at 22-33.)

B. <u>Severe Impairments</u>

The ALJ determined that Plaintiff's depression, by itself or in combination with other impairments, did not cause more than a minimal limitation in Plaintiff's ability to perform basic mental work activities and thus was non-severe. (R. 72.) Moreover, both Dr. Miarrostami and Dr. Esteban noted that Plaintiff was fully oriented. (R. 335, 343, 349, 353.)

Furthermore, Plaintiff's supposed severe impairment of gastritis is belied by her employment history. Despite having gastritis since she was twenty-five years old, (R. 98-99), Plaintiff previously worked in a car auction house and most recently as a waitress (R. 85-89). What is more, Plaintiff never informed Dr. Teli that she suffered from gastritis during a consultative examination, (R. 301), and gastrointestinal examinations conducted separately by both Dr. Miarrostami and Dr. Esteban indicated that Plaintiff's condition was normal. (See R. 335, 343, 349, 353.) Thus, Plaintiff's gastritis was not a severe impairment.

C. <u>Plaintiff's RFC</u>

The ALJ found that Plaintiff has the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). (R. 73.)

In reaching his decision, the ALJ considered Plaintiff's subjective complaints and found them to be "exaggerated." (R. 74.)

     1.  <u>Subjective Complaints</u>

The Second Circuit has held that "the subjective element of pain is an important factor to be considered in determining disability." <u>Mimms v. Heckler</u>, 750 F.2d 180, 185 (2d Cir. 1984). However, "[t]he ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." <u>McLaughlin v. Sec'y of Health, Educ. & Welfare</u>, 612 F.2d 701, 705 (2d Cir. 1980) (alteration in original) (internal quotation marks and citation omitted). The Court will uphold an ALJ's decision discounting a plaintiff's subjective complaints of pain, as long as the decision is supported by substantial evidence. <u>See Aponte v. Sec'y, Dep't of Health & Human Servs.</u>, 728 F.2d 588, 591-92 (2d Cir. 1984).

Simply stated, Plaintiff faced minimal intrusions on her daily life. Plaintiff testified that she could never breathe and that medication made everything "blurry." (R. 91.) However, Plaintiff drove a car and attended church at various points. (R. 240, 242-43.) Plaintiff also traveled to Florida on one occasion. (R. 343.) Plaintiff, moreover, was described as a "heavy smoker for over 35 years" and refused to quit. (<u>See</u> R. 71, 74.) Specifically, Plaintiff continued to smoke cigarettes despite

diagnoses of COPD and repeated requests from Dr. Miarrostami and other doctors to stop smoking. (See, e.g., R. 73-74); O'Brien v. Colvin, No. 13-CV-0091, 2014 WL 4416952, at *16 (E.D.N.Y. Sept. 14, 2014) (finding that the ALJ "did not err in discrediting Plaintiff's statements regarding the severity of his symptoms," in part, because Plaintiff claimed that "any exposure to respiratory irritants aggravated his conditions" but continued to smoke daily). These contradictions support the ALJ's decision to discount Plaintiff's subjective complaints. See, e.g., Vargas v. Astrue, No. 10-CV-6306, 2011 WL 2946371, at *15 (S.D.N.Y. July 20, 2011); Shriver v. Astrue, No. 07-CV-2767, 2008 WL 4453420, at *2 (E.D.N.Y. Sept. 30, 2008).

Nor did Plaintiff's arthritis prevent her from engaging in light work. For example, Dr. Esteban found that Plaintiff's gait was normal, as were all of Plaintiff's major muscle groups. (R. 335.) Similarly, Dr. Miarrostami noted that Plaintiff's overall muscle strength was normal and that she had no joint pain. (R. 343, 348-49, 350.) Furthermore, Plaintiff ambulates without the need for an assistive device and has full range of motion with all joints. (R. 74.)

Moreover, Dr. Teli's opinions and findings bolstered the ALJ's assessment. Dr. Teli determined that Plaintiff walked with a normal gait, exhibited a full range of motion, and displayed full strength and normal reflexes. (R. 302-03.) Notably, Dr.

Teli opined Plaintiff faced no limitations except for a need to avoid respiratory irritants. (R. 303.)

### 2. Treating Physician Rule

The ALJ also did not violate the treating physician's rule because he articulated his reasons for declining to afford controlling weight to certain portions of Dr. Fazio's opinion and Dr. Esteban's opinion. Particularly, Dr. Fazio opined that Plaintiff could not perform sedentary work. (R. 265-66.) Dr. Esteban believed that Plaintiff could only stand or walk for less than two hours per day, sit for less than six hours per day, lift ten pounds occasionally, and that she had additional postural limitations due to back pain, neck pain, and COPD. (See R. 340.)

Under the treating physician rule, the medical opinions and reports of a claimant's treating physicians are generally afforded "special evidentiary weight." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Specifically, the regulation states:

> Generally, we give more weight to opinions from your treating sources . . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2) (second and third alteration in original). To comply with the requirements of the treating

physician rule, the ALJ must "set forth her reasons for the weight she assigns to the treating physician's opinion." Shaw, 221 F.3d at 134; see 20 C.F.R. § 404.1527; see also Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (explaining that "[a] claimant . . . who knows that her physician has deemed her disabled, might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied").

When an ALJ does not accord controlling weight to the medical opinion of a treating physician, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted) (per curiam); see also Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). These factors include:

> (1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist.

Schnetzler, 533 F. Supp. 2d at 286; see also 20 C.F.R. § 404.1527(d)(2); Halloran, 362 F.3d at 32. But see Khan v. Comm'r of Social Sec., No. 14-CV-4260, 2015 WL 5774828, at *14 (E.D.N.Y. Sept. 30, 2015) (noting that even though new regulations do not require an ALJ to re-contact a treating physician to resolve an

inconsistency or efficiency, "it may be incumbent upon the ALJ to re-contact medical sources in some circumstances"); see also Vanterpool v. Colvin, No. 12-CV-8789, 2014 WL 1979925, at *17 (S.D.N.Y. May 15, 2014) ("Because the ALJ did not reject [the treating physician's] opinion due to gaps in the record, he was not required to contact the physician for further information or clarification.").

Nevertheless, the Second Circuit has made clear that the ALJ need not produce a "slavish recitation of each and every factor [set forth in 20 C.F.R. § 404.1527(c)] where the ALJ's reasoning and adherence to the regulation are clear." See Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013); see also Khan v. Astrue, No. 11-CV-5118, 2013 WL 3938242, at *15 (E.D.N.Y. July 30, 2013). Rather, the ALJ need only apply "the substance of the treating physician rule." Halloran, 362 F.3d at 32. In Halloran, for example, "it [was] unclear on the face of the ALJ's opinion whether the ALJ considered (or even was aware of) the applicability of the treating physician rule." Id. at 32. Even still, the Second Circuit upheld the ALJ's opinion because "the substance of the treating physician rule was not traversed." Id. So too here.

First, Dr. Fazio's statement that Plaintiff could not perform sedentary work has no support in the Record. (See R. 264-66.) As discussed above, the ALJ determined that Plaintiff could perform light work based on the minimal intrusions she experienced

on a daily basis. Second, Dr. Esteban's opinion on Plaintiff's inability to stand or sit for long periods of time, among other things, is based on Plaintiff's subjective complaints, which were rejected above. (See R. 339-40.) Dr. Esteban's opinion is also belied by her own treatment notes. Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013) ("Because [the doctor's] medical source statement conflicted with his own treatment notes, the ALJ was not required to afford his opinion controlling weight."). Dr. Esteban's diagnostic tests and examination of Plaintiff showed few abnormalities. (R. 334-35.) It appears that her opinion is based upon the Plaintiff's subjective complaints and was obtained solely for the purpose of helping the Plaintiff obtain disability. (R. 74.)

Furthermore, the ALJ's failure to explicitly address Dr. Miarrostami's findings--specifically, that Plaintiff could not work or could not perform sedentary work--does not change this result. (R. 74-75, 272, 375.) In fact, Dr. Miarrostami's opinion on this issue closely mirrored the opinion of Dr. Esteban. (Compare R. 375 (determining, in Dr. Miarrostami's opinion, that Plaintiff could only stand or walk for less than two hours per day, sit for less than six hours per day, and lift ten pounds occasionally, among other things) with R. 340 (finding, in Dr. Esteban's opinion, that Plaintiff could only stand or walk for less than two hours per day, sit for less than six hours per day,

and lift ten pounds occasionally, among other things).) Indeed, remand is not required by this omission. <u>Zabala v. Astrue</u>, 595 F.3d 402, 10 (2d Cir. 2010) (finding that remand was unnecessary because the ALJ overlooked one doctor's report but had considered another report, which was "largely identical").

    D.   <u>ALJ's Findings at Steps Four and Five</u>

After finding at step four that Plaintiff could not perform her past relevant work, the ALJ proceed to step five. (R. 74-75.) Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there are jobs that exist in significant numbers in the national economy that she can perform. (R. 75.) The ALJ noted the limitation that was included in the RFC--that Plaintiff must avoid excessive exposure to airborne irritants and environmental allergens--had little to no effect on the occupational base of light work. (R. 75.) And as the Second Circuit stated, "'[w]here it is clear that the additional limitation or restriction has very little effect on the exertional occupational base, the conclusion directed by the appropriate rule . . . would not be affected.'" <u>Bergen v. Astrue,</u> No. 06-CV-3419, 2007 WL 2219474, at *4-5 (E.D.N.Y. July 31, 2007) (quoting SSR 83-14, 1983 WL 31254, at *6 (SSA)). Thus, the ALJ determined that Plaintiff was not disabled.

E.    Evidence Submitted to the Appeals Council

Finally, any additional evidence Plaintiff submitted to the Appeals Council that was related to the period before April 17, 2013 would not change the result. As an initial matter, if a claimant submits new and material evidence, the Appeals Council will only consider it if the evidence relates to the period on or before the date of the ALJ's decision. See, e.g., 20 C.F.R. § 404.970(b). For instance, Dr. O'Connor reported no fatigue, malaise, or gastrointestinal issues. (R. 385-86.) Dr. Indaram similarly noted that Plaintiff exhibited normal breathing and her abdomen, lungs, and cardiovascular systems were normal. (R. 388.) Further, records from a May 2012 emergency room visit indicated that Plaintiff was alert and fully oriented. (R. 501.) And after Plaintiff received treatment, she started breathing without difficulty and was discharged the same day. (R. 507.)[3]

Accordingly, the Commissioner's motion is GRANTED.

---

[3] By and large, the remainder of the evidence submitted does not relate to the period before April 17, 2013. (See, e.g., R. 2.) Dr. Abott, for example, did not assist Plaintiff until May 2013. (R. 478-79.) And Dr. Lvov did not start treating Plaintiff until July 2013. (R. 45-53.) In that regard, the Appeals Council advised Plaintiff could reapply for benefits for the period after April 17, 2013. (R. 2.)

## CONCLUSION

For the foregoing reasons, the Commissioner's motion (Docket Entry 15) is GRANTED. The Clerk of the Court is directed to mark this matter CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    March   31  , 2016
          Central Islip, New York